UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X    **05 CIV 2590 (SAS)**
IBETO PETROCHEMICAL INDUSTRIES,
LTD.,

                          Plaintiff,         NOTICE OF MOTION


          -against-


M/T "BEFFEN", her engines, tackle,
boiler, etc *in rem;* and BRYGGEN
SHIPPING AND TRADING A/S, *in
personam,*

                          Defendants.
----------------------------------------X


     PLEASE TAKE NOTICE, that upon the annexed Declaration of

Uncontested Facts Pursuant to Local Rule 56.1 and the exhibits

thereto attached, Memorandum of Law, and all the prior pleadings

and proceedings in this action, defendant BRYGGEN SHIPPING AND

TRADING A/S (BRYGGEN) will move the Court before the Honorable

Shira A. Scheindlin at the Courthouse located at 500 Pearl Street,

New York, New York, for an order, pursuant to Rules 12(b)(3) and 56

of the Federal Rules of Civil Procedure, 9 U.S.C. §§ 3 and 201 et

seq., and 46 U.S.C. § 1304(5), dismissing or staying plaintiff's

claim in favor of London arbitration and enjoining litigation of

this dispute in Nigeria, or, in the alternative, declaring that any

recovery by plaintiff shall be limited to the $500 limitation of

liability, and granting to BRYGGEN such other and further relief as

this Honorable Court may deem just and proper.

Dated:   New York, New York
         September 9, 2005

                                    MAHONEY & KEANE, LLP
                                    Attorneys for Defendant
                                    BRYGGEN SHIPPING & TRADING A.S.

                         By:        Edward A. Keane (1398)
                                    111 Broadway, Tenth Floor
                                    New York, New York 10006
                                    (212) 385-1422


TO:   HILL RIVKINS & HAYDEN LLP
      Attorneys for Plaintiff
      45 Broadway  Suite 1500
      New York, NY 10006
      (212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X    **05 CIV 2590 (SAS)**
IBETO PETROCHEMICAL INDUSTRIES,
LTD.,

                        Plaintiff,       DECLARATION PURSUANT
                                         TO LOCAL RULE 56.1

      -against-

M/T "BEFFEN", her engines, tackle,
boiler, etc  *in rem;* and BRYGGEN
SHIPPING AND TRADING A/S,  *in
personam,*

                        Defendants.
----------------------------------------X


    I, Edward A. Keane, an attorney duly admitted to practice
before this Honorable Court, hereby declare as follows:

    I am a partner with the law firm of MAHONEY & KEANE, LLP,
counsel of record for defendant, BRYGGEN SHIPPING AND TRADING A.S.
(BRYGGEN) in the above-captioned action.  Based upon my personal
knowledge and my review of the file maintained by my office, I am
familiar with the prior pleadings and proceedings in connection
with this matter, and I respectfully submit this statement of
undisputed facts in support of defendants' instant motion for
summary judgment.

    1.  Plaintiff seeks damages arising from the alleged
contamination of a cargo of base oil shipped from the United States
port of Paulsboro to Lagos, Nigeria aboard the M/V BEFFEN pursuant
to Tanker Bills of Lading numbered 1, 2, and 3 dated February 6,

2004. (Complaint, Exhibit 1 to Landoey Declaration; Statement of Claim, Exhibit 5 to Landoey Declaration). All three bills of lading contain the identical language that "[t]his shipment is carried under and pursuant to the terms of the Charter Party dated 31 December 2003 between Chemlube International Inc. as Charterer and Bryggen Shipping and Trading A/S as Owner and all conditions and exceptions whatsoever thereto." (Landoey Declaration, at ¶ 2; Bill of Lading, Exhibit 2A).

2.    According to the fixture, the charter party is dated "31ST DECEMBER 2003." (Charter Party, Exhibit 2B to Landoey Declaration). The fixture references the "ASBATANK C/P" and the "CHEMLUBE TERMS." Id. Clause 24 of the ASBATANKVOY form calls for arbitration of "[a]ny and all disputes" in London or New York, "whichever place is specified" elsewhere in the charter. (ASBATANKVOY Terms, Exhibit 2C to Landoey Declaration, at ¶ 24). Clause 23 of the Chemlube Terms states "General Average/Arbitration clause General average, arbitration to be in London, English law to apply." (Chemlube Terms, Exhibit 2D to Landoey Declaration, at ¶ 23).

3.    Plaintiff thus obtained a bond to secure the claim in Nigeria, where the vessel could be threatened with arrest. (Landoey Declaration, at ¶ 4 ; Statement of Claim, Exhibit 5 to Landoey Declaration). However, plaintiff commenced arbitration with BRYGGEN and appointed an arbitrator for the claim in London, conceding the applicability of the London arbitration agreement. (Letter dated March 4, 2005, Exhibit 3 to Landoey Declaration) ("We

2

now call upon you to join in the appointment of a sole arbitrator in respect of all and any claims arising under the above Bills of Lading in accordance with the reference 'arbitration to be in London' at Clause 23 of the Chemlube Terms dated September 2002 which form part of the Charterparty/Fixture Note date 31st December 2003 which, in turn, is incorporated into the Bills of Lading contracts.").

4.    But Clause 20 of the ASBATANKVOY Terms contractually incorporates the United States Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq., (ASBATANKVOY Terms, Exhibit 2C to Landoey Declaration), and the fixture's notation of "FREIGHT LUMPSUM" also confirms that the cargo would be considered as one "customary freight unit" for the purposes of the COGSA limitation of liability, 46 U.S.C. § 1304(5).  (Charter Party, Exhibit 2B to Landoey Declaration).

5.    Plaintiff thus proceeded to "withdraw" the arbitration, without BRYGGEN's consent, and expressed its intention to litigate the claim in Nigeria.  (Letter dated August 9, 2005, Exhibit 2E to Landoey Declaration).

6.    In the letter of plaintiff's counsel submitted in response to BRYGGEN's required letter seeking a pre-motion conference and laying out the grounds for the motion sub judice, plaintiff for the first time expressed a willingness to dismiss its claims in New York, as well.

3

7.    Plaintiff has made it no secret that plaintiff's withdrawal of arbitration and efforts to see the United States action dismissed without prejudice have been perpetrated in an attempt to avoid the application of COGSA and its limitation of liability, since Your Declarant is advised that the Nigerian court would apply domestic law, rather than COGSA. (Landoey Declaration, at ¶ 6; Koku Declaration, Exhibit 4 to Landoey Declaration; Letter dated August 2, 2005, Exhibit 6 to Landoey Declaration). And, while Nigeria's domestic law provides for a liability limitation based on a "package" or "unit," it does not contain a limitation based on the "customary freight unit" provided by COGSA. Id.

8.    The Nigerian action plainly involves the same parties and the same claim of loss as those in the withdrawn arbitration in London and the instant action in New York. (Complaint, Exhibit A to Landoey Declaration; Letter dated March 4, 2005, Exhibit 4 to Landoey Declaration; Statement of Claim, Exhibit 5 to Landoey Declaration). In fact, the Nigerian lawsuit concerns only a lesser included portion of the claim asserted in London and New York, since the Nigerian action involves only one of the three bills of lading, and thus only $500,000 in purported damages, while the London and New York proceedings were brought pursuant to all three bills of lading and allege damages in the amount of $2,000,000. Id.

9.    Moreover, aside from issuing the order of arrest, the case has not been meaningfully prosecuted.  (Koku Declaration, Exhibit 4 to Landoey Declaration).  The Nigerian court has not reached the merits of the case.  <u>Id</u>.  Now that plaintiff's intentions have become clear, a hearing has been scheduled, but still only as to preliminary matters, and will not even go forward until October 6, 2005.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

New York, New York
Executed on
September 9, 2005

Respectfully submitted,

MAHONEY & KEANE, LLP
Attorneys for Defendants
BRYGGEN SHIPPING & TRADING A.S.

By:

Edward A. Keane  (EK 1398)
111 Broadway, Tenth Floor
New York, New York 10006
(212) 385-1422

TO:    HILL RIVKINS & HAYDEN LLP
       Attorneys for Plaintiff
       45 Broadway  Suite 1500
       New York, New York 10006
       (212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X    **05 CIV 2590 (SAS)**
IBETO PETROCHEMICAL INDUSTRIES, LTD.,

                         Plaintiff,        DECLARATION

      -against-

M/T "BEFFEN", her engines, tackle,
boiler, etc *in rem;* and BRYGGEN
SHIPPING AND TRADING A/S, *in personam,*

                 Defendants.
------------------------------------------X

    I, BJOERN PAUL LANDOEY, hereby declare as follows:

    I am the Operations Manager for defendant, BRYGGEN
SHIPPING AND TRADING A.S. (BRYGGEN), in the above-captioned
action. Based upon my personal knowledge and my review of the
file maintained by my office, I am familiar with the facts and
circumstances underlying this matter.

    1.   Herewith attached are true copies of the following:

| | |
|---|---|
| Exhibit 1: | Plaintiff's Summons and Complaint dated March 4, 2005; |
| Exhibit 2: | BRYGGEN's Amended Answer with Affirmative Defenses and Counter-Claims dated August 10, 2005; |
| Exhibit 2A: | Tanker Bill of Lading dated February 6, 2004 pursuant to which plaintiff has brought suit; |
| Exhibit 2B: | Charter Party Fixture dated December 31, 2003; |
| Exhibit 2C: | ASBATANKVOY Charter Party Terms; |
| Exhibit 2D: | Chemlube Charter Party Terms; |
| Exhibit 2E: | Letter from plaintiff's counsel dated August 9, 2005; |
| Exhibit 3: | Letter from plaintiff's counsel |

dated March 4, 2005;

Exhibit 4:    Declaration of Babajide Koku;

Exhibit 5:    Plaintiff's Statement of Claim in the Federal High Court at Lagos; and

Exhibit 6:    Letter from plaintiff's counsel dated August 2, 2005, with the amount of settlement demand redacted.

2.    Plaintiff seeks damages arising from the alleged contamination of a cargo of base oil shipped from the United States port of Paulsboro to Lagos, Nigeria aboard the M/V BEFFEN pursuant to Tanker Bills of Lading numbered 1, 2, and 3 dated February 6, 2004. (Complaint, Exhibit 1; Statement of Claim, Exhibit 5). All three bills of lading contain the identical language that "[t]his shipment is carried under and pursuant to the terms of the Charter Party dated 31 December 2003 between Chemlube International Inc. as Charterer and Bryggen Shipping and Trading A/S as Owner and all conditions and exceptions whatsoever thereto." (Bill of Lading, Exhibit 2A).

3.    According to the fixture, the charter party is dated "31ST DECEMBER 2003." (Charter Party, Exhibit 2B). The fixture references the "ASBATANK C/P" and the "CHEMLUBE TERMS." Id. Clause 24 of the ASBATANKVOY form calls for arbitration of "[a]ny and all disputes" in London or New York, "whichever place is specified" elsewhere in the charter. (ASBATANKVOY Terms, Exhibit 2C, at ¶ 24). Clause 23 of the Chemlube Terms

2

states "General Average/Arbitration clause General average, arbitration to be in London, English law to apply." (Chemlube Terms, Exhibit 2D, at ¶ 23).

4.    Plaintiff thus obtained a bond to secure the claim in Nigeria, where the vessel could be threatened with arrest. (Letter dated August 9, 2005, Exhibit 2E). However, plaintiff commenced arbitration with BRYGGEN and appointed an arbitrator for the claim in London, conceding the applicability of the London arbitration agreement. (Letter dated March 4, 2005, Exhibit 3) ("We now call upon you to join in the appointment of a sole arbitrator in respect of all and any claims arising under the above Bills of Lading in accordance with the reference 'arbitration to be in London' at Clause 23 of the Chemlube Terms dated September 2002 which form part of the Charterparty/Fixture Note date 31st December 2003 which, in turn, is incorporated into the Bills of Lading contracts.").

5.    But Clause 20 of the ASBATANKVOY Terms contractually incorporates the United States Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq., (ASBATANKVOY Terms, Exhibit 2C), and the fixture's notation of "FREIGHT LUMPSUM" also confirms that the cargo would be considered as one "customary freight unit" for the purposes of the COGSA limitation of liability, 46 U.S.C. § 1304(5). (Charter Party, Exhibit 2B).

6.    Plaintiff thus proceeded to "withdraw" the arbitration, without BRYGGEN's consent, and expressed its

3

intention to litigate the claim in Nigeria. (Letter dated August 9, 2005, Exhibit 2E). Plaintiff has made it no secret that plaintiff's withdrawal of arbitration and efforts to see the United States action dismissed without prejudice have been perpetrated in an attempt to avoid the application of COGSA and its limitation of liability, since Your Declarant is advised that the Nigerian court would apply domestic law, rather than COGSA. (Koku Declaration, Exhibit 4). And, while Nigeria's domestic law provides for a liability limitation based on a "package" or "unit," it does not contain a limitation based on the "customary freight unit" provided by COGSA. Id.

7. The Nigerian action plainly involves the same parties and the same claim of loss as those in the withdrawn arbitration in London and the instant action in New York. (Complaint, Exhibit A; Letter dated March 4, 2005, Exhibit 3; Statement of Claim, Exhibit 5). In fact, the Nigerian lawsuit concerns only a lesser included portion of the claim asserted in London and New York, since the Nigerian action involves only one of the three bills of lading, and thus only $500,000 in purported damages, while the London and New York proceedings were brought pursuant to all three bills of lading and allege damages in the amount of $2,000,000. Id. Moreover, Nigerian counsel informs that aside from issuing the order of arrest, the case has not been meaningfully prosecuted. (Koku Declaration, Exhibit 4). The Nigerian court has not reached

the merits of the case.  Id.  Now that plaintiff's intentions
have become clear, a hearing has been scheduled, but still only
as to preliminary matters, and will not even go forward until
October 6, 2005.  Id.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of
perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on August 31st, 2005

BJOERN PAUL LANDOEY

BRYGGEN
SHIPPING &
TRADING A/s
of Bergen

= 2060-DM

Keith B. Dalen (KD-4997)
HILL RIVKINS & HAYDEN LLP
Attorneys for Plaintiff
45 Broadway, Suite 1500
New York, NY 10006
(212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

IBETO PETROCHEMICAL INDUSTRIES,
LIMITED,

                Plaintiff,

    - against –

M/T BEFFEN, her engines, tackle, boiler,
etc., *in rem;* and BRYGGEN SHIPPING AND
TRADING A/S, *in personam*,

                Defendants.

-----------------------------------------------------------------x

Index No.:

C5 CV 2590
C SAS)

**COMPLAINT**

       The plaintiff herein, by its attorneys, Hill Rivkins & Hayden LLP, complaining of

the above named vessel and defendant, allege upon information and belief:

       FIRST:     This is an admiralty and maritime claim within the meaning of

Rule 9(h) of the Federal Rules of Civil Procedure.

       SECOND:    At and during all times hereinafter mentioned, plaintiff had and

now has the legal status and principal office and place of business stated in Schedule A

hereto annexed and by this reference made a part hereof.

       THIRD:     At and during all the times hereinafter mentioned, defendant had

and now has the legal status and office and place of business stated in Schedule A, and

was and now is engaged in business as common carrier of merchandise by water for hire,

and owned, operated, managed, chartered and controlled the above named vessel which
now is or will be within the jurisdiction of this Court during the pendency of this action.

     FOURTH:     On or about the date and at the port of shipment stated in Schedule
A, there was delivered to the vessel and defendant in good order and condition the
shipment described in Schedule A, which the said vessel and defendant received,
accepted and agreed to transport for certain consideration to the port of destination stated
in Schedule A.

     FIFTH:     Thereafter, the said vessel arrived at the port of destination
described in Schedule A and the cargo was not delivered in the same good order and
condition in which it was received.

     SIXTH:     Defendant, by reason of the premises, breached its duties to the
plaintiff as common carrier by water for hire and was otherwise at fault.

     SEVENTH:     Plaintiff was the shipper, consignee or owner or otherwise had a
proprietary interest of and in the cargo as described in Schedule A, and brings this action
on its own behalf and, as agents and trustees, on behalf of and for the interest of all
parties who may be or become interested in the said shipment, as their respective interests
may ultimately appear, and plaintiff is entitled to maintain this action.

     EIGHTH:     Plaintiff has duly performed all duties and obligations on its part to
be performed.

     NINTH:     By reason of the premises, plaintiff has sustained damages as
nearly as same can now be estimated, no part of which has been paid, although duly
demanded in the amount of $2,000,000.00.

**W H E R E F O R E**, plaintiff prays:

1.    That process in due form of law according to the practice of this Court may issue against defendants.

2.    That if defendants cannot be found within this District, that all of their property within this District be attached in the sum set forth in the complaint, with interest and costs.

3.    That a decree may be entered in favor of plaintiff against defendants for the amount of plaintiff's damages, together with interest and costs.

4.    That process in due form of law according to the practice of this Court may issue against the aforesaid named vessel.

5.    Plaintiff further prays for such other, further and different relief as to this Court may seem just and proper in the premises.

Dated: New York, New York
       March 4, 2005

HILL RIVKINS & HAYDEN LLP
Attorneys for Plaintiff

By: _____
       Keith B. Dalen (KD-4997)
       45 Broadway, Suite 1500
       New York, NY 10006
       212-669-0600

## SCHEDULE A

Plaintiff, Ibeto Petrochemical Industries, Limited, was and now is a corporation duly organized and existing under and by virtue of the laws of Nigeria with an office and place of business at 4A Adeola, Hopewell Street, Victoria Island, Lagos, Nigeria.

Defendant, Bryggen Shipping And Trading A/S, was and now is a foreign corporation with an office and place of business at Gullskogarden, Bryggen 47, 5003 Bergen, Norway.

| | |
|---|---|
| Date of Shipment: | 6 February 2004 |
| Port of Loading: | Paulsboro |
| Port of Discharge: | Lagos |
| Shipper: | Chemlube International, Inc. |
| Consignee: | To the Order of BNP Paribas (Suisse) S.A., Geneva, Switzerland |
| Notify: | Ibeto Petrochemical Industries, Ltd. |
| Description of Shipment: | Brightstock 150 BS, Base Oil SN 150 and SN 700, raw material for lube oil preparation as set forth in bills of lading 1, 2 and 3 dated 6 February 2004 |
| Nature of Loss or Damage: | Contamination |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X     **05 CIV 2590 (SAS)**
IBETO PETROCHEMICAL INDUSTRIES,
LTD.,

                              Plaintiff,       AMENDED ANSWER WITH
                                                AFFIRMATIVE DEFENSES
        -against-                AND COUNTER-CLAIMS

M/T "BEFFEN", her engines, tackle,
boiler, etc *in rem*; and BRYGGEN
SHIPPING AND TRADING A/S, *in
personam,*

                         Defendants.
----------------------------------------X

        Defendant BRYGGEN SHIPPING & TRADING A.S. ("BRYGGEN"), by
its attorneys MAHONEY & KEANE, LLP, answers the Complaint of
plaintiff upon information and belief, and without waiver of any
right to arbitrate or proceed in another forum, as follows:

        FIRST:   Defendant   BRYGGEN   denies   knowledge   or
information sufficient to form a belief as to the allegations
contained in paragraphs "FIRST", "SECOND" and "SEVENTH" of
plaintiff's Complaint.

        SECOND:   Defendant   BRYGGEN   denies   each   and   every
allegation contained in paragraphs "THIRD", "FOURTH", "FIFTH",
"SIXTH", "EIGHTH" and "NINTH" of plaintiff's Complaint.

   AS AND FOR A FIRST SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

        THIRD:   The Complaint fails to state a claim  against
defendant BRYGGEN on which relief can be granted.

  AS AND FOR A SECOND SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

        FOURTH:   Defendant BRYGGEN is not liable to plaintiff on
the causes of action alleged in the Complaint.

AS AND FOR A THIRD SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

FIFTH:    If there was any loss and/or damage to cargo as alleged in the Complaint it was occasioned by causes for which the defendant BRYGGEN is exonerated under the United States Carriage of Goods by Sea Act, Title 46 U.S.C.A. §  1300, et seq.

AS AND FOR A FOURTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

SIXTH: If this Honorable Court finds that the plaintiff has suffered damages to cargo for which defendant BRYGGEN is liable, said damages must be limited pursuant to 46  U.S.C.A. 1304 (5).

AS AND FOR A FIFTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

SEVENTH:  If there was any loss of and/or damage to cargo as alleged in the Complaint, defendant BRYGGEN is not liable to the plaintiff by reasons of the provisions contained in the bill(s) of lading, contract of carriage, charter party, applicable tariffs, special contract, or dock receipt.

AS AND FOR A SIXTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

EIGHTH:    If there was any loss/and or damage to cargo as alleged in the Complaint, it was occasioned by causes for which the defendant BRYGGEN is exonerated under the Harter Act, Title 46 U.S.C.A. § 190, et seq.

2

AS AND FOR A SEVENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

NINTH:      Defendant BRYGGEN puts plaintiff to its proof of compliance with the provisions for giving of notice and the commencement of suit as provided for in the aforesaid bill(s) of lading and in the United States Carriage of Goods by Sea Act, 1936.

AS AND FOR AN EIGHTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TENTH:      Any loss or damage to the goods, as alleged in the Complaint, that may have occurred while they were in the possession of custody of defendant BRYGGEN or on board the carrying vessel(s) arose from the conditions of the goods when delivered to defendant BRYGGEN or from wastage in bulk weights or from inherent defect, quality or vice of the goods, or insufficient packing, insufficiency or inadequacy of marks, latent defects not discoverable by due diligence, or by acts or omissions of the shipper(s) or owner of the goods, their agent or representatives, and defendant BRYGGEN is not under any liability for any such loss or damage.

AS AND FOR A NINTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

ELEVENTH:      (A) Due diligence was used to make the carrying vessel(s) seaworthy and to secure that they were properly manned, equipped and supplied, and to make the holds and other parts of the ships in which the goods were carried safe and fit for their reception, carriage and preservation in accordance with the provisions of the United States Carriage of Goods by Sea Act, 1936 and the aforesaid bill(s) of lading.

3

(B) Accordingly, if the goods sustained any loss or damage while they were on board the carrying vessel(s), due to any unseaworthiness of the vessels, which is denied, defendant BRYGGEN is not under liability therefore.

AS AND FOR A TENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWELFTH:    Plaintiff's claim is barred by the statute of limitations contained in both the aforesaid bill(s) of lading and the United States Carriage of Goods by Sea Act, 1936 and/or the Doctrine of Laches.

AS AND FOR AN ELEVENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTEENTH:    Any damages sustained by plaintiff, as alleged in the Complaint, were proximately, directly, and solely caused by the negligent acts of third persons over whom defendant BRYGGEN had and has no direction or control.

AS AND FOR A TWELFTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

FOURTEENTH:    Plaintiff knowingly and intentionally assumed any and all risks inherent in the shipment(s) of the goods at issue by sea, which is a complete bar to recovery.

AS AND FOR A THIRTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

FIFTEENTH:    Any injuries that may have been sustained by plaintiff, as alleged in its Complaint, occurred as a direct result of plaintiff's own negligent conduct, and not by any negligence of defendant BRYGGEN and as such plaintiff is barred from recovery in this action.

AS AND FOR A FOURTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

SIXTEENTH:  Plaintiff is guilty of culpable conduct in the events giving rise to the claims now asserted in plaintiff's Complaint, and its recovery, if any, must be diminished in proportion thereto.

AS AND FOR A FIFTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

SEVENTEENTH:  Plaintiff herein has failed to mitigate its damages.

AS AND FOR A SIXTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

EIGHTEENTH:  The forum is inconvenient and the Complaint should be dismissed pursuant to the Doctrine of Forum Non Conveniens.

AS AND FOR A SEVENTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

NINETEENTH:  The action, or part thereof, is founded upon improper venue and/or should be transferred pursuant to 28 U.S.C. § 1404.

AS AND FOR A EIGHTEENTH SEPARATE AND COMPLETE
AFFIRMATIVE DEFENSE

TWENTIETH:  The terms of the bill of lading, tariff, contract of affreightment and/or other governing contracts between the parties require that this matter be heard in a forum other than this Court.

AS AND FOR AN NINETEENTH SEPARATE AND COMPLETE AFFIRMATIVE
DEFENSE

TWENTY-FIRST:  Plaintiff has failed to bring defendants BRYGGEN within the personal jurisdiction of the Court.

5

AS AND FOR A TWENTIETH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-SECOND:  This Court lacks personal jurisdiction of the defendant BRYGGEN.

AS AND FOR A TWENTY-FIRST SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-THIRD:  Plaintiff has failed to make proper service of process upon defendant BRYGGEN.

AS AND FOR A TWENTY-SECOND SEPARATE AND COMPLETE
AFFIRMATIVE DEFENSE

TWENTY-FOURTH:  This Answer is made  without waiver of any jurisdictional defenses or rights to arbitrate that may exist between the parties.

AS AND FOR A TWENTY-THIRD SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-FIFTH: If this Honorable Court finds that the plaintiff has suffered damages to cargo for which defendant BRYGGEN is liable, said damages must be limited pursuant to 46  U.S.C.A. 1304(5).

AS AND FOR A FIRST COUNTER-CLAIM AGAINST PLAINTIFF,
IBETO PETROCHEMICAL INDUSTRIES, LTD.

TWENTY-SIXTH: This  is  a  claim  under  the  Court's Admiralty and Maritime Jurisdiction, under the Court's diversity and pendent jurisdiction, under 28 U.S.C. § 2201, and under 9 U.S.C. §§ 1 and 6.

TWENTY-SEVENTH:    At  all  times  herein  mentioned, defendant BRYGGEN SHIPPING & TRADING A.S. was and is a corporation duly organized and existing pursuant to the laws of a foreign country.

TWENTY-EIGHTH: At all times herein mentioned, plaintiff, IBETO PETROCHEMICAL INDUSTRIES, LTD., was and is a corporation duly organized and existing pursuant to the laws of a foreign country.

TWENTY-NINTH: The cargo described in Schedule A of plaintiff's Complaint was shipped pursuant to Tanker Bill of Lading #3, which provided, <u>inter alia</u>, that "[t]his shipment is carried under and pursuant to the terms of the Charter Party dated 31 December 2003 between Chemlube International Inc. as Charterer and Bryggen Shipping and Trading A/S as Owner and all conditions and exceptions whatsoever thereto." A true copy of the bill of lading is herewith attached as Exhibit A.

THIRTIETH: The fixture for the above-referenced "CHARTER PARTY DATED: 31ST DECEMBER 2003," provided, <u>inter alia</u>, for the "ASBATANK C/P" and "CHEMLUBE" terms. A true copy of the fixture is herewith attached as Exhibit B.

THIRTY-FIRST: Clause 24 of the ASBATANK form calls for arbitration of "[a]ny and all disputes" in London or New York, "whichever place is specified" elsewhere in the charter. A true copy of the ASBATANK form is herewith attached as Exhibit C.

THIRTY-SECOND: Clause 23 of the Chemlube Terms states "<u>General Average/Arbitration clause</u> General average, arbitration to be in London, English law to apply." A true copy of the CHEMLUBE Terms is herewith attached as Exhibit D.

7

THIRTY-THIRD:  Plaintiff commenced arbitration in London to recover for the loss alleged in plaintiff's complaint, but subsequently purported to "withdraw" the arbitration, advising that plaintiff intended to pursue a recovery in the courts of Nigeria. A true copy of the letter of plaintiff's counsel dated August 9, 2005 advising that London arbitration "has been closed" is herewith attached as Exhibit E.

THIRTY-FOURTH: In  light  of  the  foregoing,  BRYGGEN requests an order declaring that plaintiff's claims are required to be arbitrated in London and enjoining further proceedings in other fora inconsistent with the agreement to arbitrate.

<u>AS AND FOR A FIRST SECOND-CLAIM AGAINST PLAINTIFF,
IBETO PETROCHEMICAL INDUSTRIES, LTD.</u>

THIRTY-FIFTH:  BRYGGEN  repeats  and  realleges  the allegations contained in paragraphs "TWENTY-SIXTH" through "THIRTY FOURTH" of this Amended Answer with Affirmative Defenses and Counter-Claim.

THIRTY-SIXTH: Clause  20  of  the  ASBATANK  form incorporates into the United States Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 <u>et seq.</u>.

THIRTY-SEVENTH:    The aforesaid fixture also provided for a "FREIGHT RATE LUMPSUM 450,000."

THIRTY-EIGHTH: Pursuant  to  36  U.S.C.  §  1304(5), plaintiff's recovery, if any, is limited to $500.

THIRTY-NINTH: Without waiver of the agreement to arbitrate contained in the governing contract of carriage, should venue in this District be retained, BRYGGEN requests an order declaring that plaintiff's recovery, if any, against BRYGGEN shall be limited to $500.

WHEREFORE, defendant, BRYGGEN SHIPPING & TRADING A.S., demands judgment dismissing the Complaint herein; granting to BRYGGEN on its First Counter-Claim a judgment declaring that plaintiff's claims are required to be arbitrated in London and enjoining further proceedings in other fora inconsistent with the agreement to arbitrate; granting to BRYGGEN on its Second Counter-Claim a judgment declaring that plaintiff's recovery, if any, against BRYGGEN shall be limited to $500 pursuant to the United States Carriage of Goods by Sea Act; and awarding to BRYGGEN costs, fees, including reasonable attorneys' fees, disbursements of this action, and such other and further relief as to the Court may seem just and proper.

Dated:   New York, N.Y.
         August 10, 2005

                              MAHONEY & KEANE, LLP
                              Attorneys for Defendants
                              BRYGGEN SHIPPING & TRADING A.S.

                    By:
                              Edward A. Keane  (EK 1398)
                              111 Broadway, Tenth Floor
                              New York, New York 10006
                              (212) 385-1422

TO:   HILL RIVKINS & HAYDEN LLP
      Attorneys for Plaintiff
      45 Broadway  Suite 1500
      New York, NY 10006
      (212) 669-0600

9

27.05.2004  18:31    553200            BRYGGEN SHIPPING        SIDE  08

55326810

## TANKER BILL OF LADING #3

Shipped in apparent good order and condition by **CHEMLUBE INTERNATIONAL INC.** on board of the **M/T BIFFEN** at the port of **PAULSBORO, U.S.A.** where of **Captain KUMAR VINAYAK** is the master of this voyage, to be delivered to the port of **LAGOS**

Consignee: TO THE ORDER OF BNP PARIBAS (SUISSE) S.A., GENEVA, SWITZERLAND

A quantity in bulk said by the shipper to be:
RAW MATERIAL FOR LUBE OIL PREPARATION
BRIGHT STOCK 150 BS  **1,000MT**

These commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Ultimate country of destination is Nigeria. Diversion contrary to United States law prohibited.

CLEAN ON BOARD: **6 FEBRUARY 2004**
FREIGHT PAYABLE AS PER CHARTER PARTY

NO SED REQUIRED-AES XTN REF: 133537893-020604-01
LC REFERENCE NUMBER A20040051U,
FORM M NUMBER MF0650967 AND/OR BA04420040990033 AND
CLEAN REPORT OF INSPECTION NUMBER SCI063550001

The quantity, weight, gauge, quality, nature, value and actual condition of the cargo unknown to the vessel and the Master, to be delivered at the port of discharge or so near thereto as the vessel can safely get, always afloat upon payment of freight as agreed. This shipment is carried under and pursuant to the terms of the Charter Party dated 31 December 2003 between Chemlube International Inc. as Charterer and Bryggen Shipping and Trading A/S as Owner and all conditions and exceptions whatsoever thereto. In witness whereof, the Master (or his authorized agent) has signed three (3) Original Bills of Lading and three (3) Non-Negotiable copies of B/L of this tenor and date, one of which being accomplished, the others stand void.

Dated at <u>PAULSBORO, U.S.A.</u> this day of: **6 FEBRUARY 2004**

<u>Notify:</u>          IBETO PETROCHEMICAL INDUSTRIES LTD
4A ADEOLA HOPEWELL STREET,
VICTORIA ISLAND, LAGOS
NIGERIA

Robin Ship Agency as agents for and on behalf of
the master, Captain KUMAR VINAYAK

**NON-NEGOTIABLE**

27. MAI. 2004  16:17:45    55326    DI & EITZEN AS 47 67119801    NR.317    S.2/11
27/05/2004  16:09   55326    BRYGGEN SHIPPING A.    SIDE  01
55226810

**Sent: 31.12.2003 14:**

**Bryggen Shipping Trading, Bergen**    6 7 11 9801

| | |
|---|---|
| From: | alk@network-chartering.no |
| Sent: | 31. desember 2003 11:59 |
| To: | POST@BRYGGEN.NO |
| Subject: | FW: M/T BEFFEN EX WELLINGTON KENT-1 ST FIXTURE |

Chemlube Terms
2002.doc (45 KB...

THIS IS NETWORK CHARTERING, BERGEN
TEL +47 55 326700
FAX +47 55 327543
TLX 40264 NETWK N
WWW HTTP://WWW.NETWORK-CHARTERING.NO


PIRATS/TORE


CONGRATS WITH THE MT BEFFEN - WE HAVE FIXED HER AS PER BELOW :


QTE


-----Original Message-----
From: Ibex Maritime Ltd [mailto:info@ibexmaritime.com]
Sent: 31. desember 2003 11:51
To: NETWORK CHARTERING
Subject: M/T BEFFEN EX WELLINGTON KENT


Ref: 031231-KJM0003193

TORE / KEN

WE ARE PLEASED TO CONFIRM OWNERS HAVE LIFTED THEIR SUBJECT TO PURCHASE THE BELOW
MENTION VESSEL AND WE HAVE A CLEAN FIXTURE AS PER BELOW TERMS / CONDITIONS.

IT IS MUTUALLY UNDERSTOOD THAT VESSEL WILL BE BOUGHT BY BRYGGEN, NORWAY UPON ARRIVAL
IN PAULSBORO BETWEEN 15-25 JANUARY 2004 (WHEREAFTER VESSEL WILL CHANGE MANAGEMENT
(TESMA, DENMARK) / LOOSE ALL APPROVALS AND NEW CREW WILL BE PLACED ONBOARD.

CHARTER PARTY DATED: 31ST DECEMBER 2003

ACCOUNT: CHEMLUBE INTERNATIONAL INC, NEW YORK OR NOMINATED AFFILIATE.

OWNERS: BRYGGEN SHIPPING AND TRADING A/S, BERGEN, NORWAY

VESSEL: "BEFFEN" EX WELLINGTON KENT
        11661 DWT ON 7.149 M DRAFT
        BUILT 1980
        CLASS: LR
        LOA 126.56M
        BEAM 20.50M
        GRT/NRT 7001/4214
        14569 CBM AT 98 PCT FILLING
        3 COMPLETE SEGREGATIONS
        EPOXY COATED

LAST THREE CARGOES:

1

ANTIGEN SHIPPING                    SIDE  02
55326810

**Sent: 31.12.2003 14:18**

CLN UNLEADED CPP SUITABLE FOR LOADING LUBEOILS

TO THE BEST OF OWNERS KNOWLEGDE VESSEL IS APPROVED BY:

NONE AS SHE WILL BE TAKEN OVER BY NEW OWNERS IN PAULSBORO

PLEASE ADVISE FRESH WATER DRAFT ARRIVAL IN LAGOS BASIS FOLLOWING LOADING CONDITIONS
BASIS 50% CONSUMABLE AND ALLOWING 14 DAYS STEAM. HOMOGENEOUS CARGO FOR DISTRUBUTION TO
EVEN KEEL.

ARRIVAL DEPARTURE
10500MT: 7.13M FWEK/6.97M SWEK 7.03M 7.09M 7.35M -20/+18 SF/BM MAX
10000MT: 6.91M FWEK 6.76M SWEK 6.61M 6.88M 7.14M -22/+20 SF/BM MAX
 9000MT: 6.46M FWEK 6.32M SWEK 6.19M 6.44M 6.71M -15/+40 SF/BM MAX

ITINERARY OF VESSEL:
VSL IS SCHEDULES TO LOAD IN SAINT JOHN NB DEC 18-22-26-30 -
JAN 3-6-10-14-18 FOR DISCH PORTLAND, MAIN DEC 21-23, 23-25,
28-30, JAN 1-3 SEARSPORT 5, PORTLAND 10-14-18 . PORTLAND IS
IN MOST CASES EXXON MOBIL AND IRVING OIL SPLIT DISCHARGE.

FOR

-MIN. 8,000 MTS UPTO FULL AND COMPLETE CARGO (APPROX 10500 MTS)  IN CHOPT UPTO 5 GRDS
WVNS INCLUDING BRIGHTSTOCK LUBEA.
 QUANTITY TO BE LOADED TO BE DECLARED LATEST 5 DAY PRIOR ARRIVAL  IN LOADPORT. BS
LUBES TO BE LOADED AT MINIMUM 50 DEGR C AND
 VESSEL TO MAINTAIN LOADED TEMP DURING VOYAGE AND DISCHARGE. -LOADING OPB PAULSBORO,
PHILADELPHIA IN CHOPT OPTION OSX
 SAVANNAH, GEORGIA USA. IF SAVANNAH IS DECLARED THEN PAULSBORO  TO BE FIRST LOADPORT.
LOADPORT(S) TO BE DECLARED LATEST UPON  ARRIVAL IN PAULSBORO.
 ANY ADDITIONAL BERTHS TO BE FOR CHARTERERS ACCOUNT.
-DISCHARGE 1-2 SB LAGOS, NIGERIA.
 ANY ADDITIONAL BERTHS TO BE FOR RECEIVERS/CHARTERERS ACCOUNT,  AND SETTELED DIRECTLY
WITH THEM. -LAYDAYS 15TH JANUARY - 30TH JANUARY 2004  LAYDAYS TO BE NARROWED INTO 5
DAYS SPREAD LATEST 10 DAYS BEFORE
 ARRIVAL IN LOADPORT BY OWNERS, IN ANY CASE NO LATER THAN JAN 15TH. -FREIGHT RATE
LUMPSUM USD 450,000.- BASIS 1/1  FREIGHT RATE LUMPSUM USD 475,000.- BASIS 2/1  FREIGHT
PAYABLE BEFORE BREAKING BULK -LAYTIMB 125 MTPH LOAD / 75 MTPH DISCHARGE SHINC
REVERSIBLE -DEMURRAGE USD 8,000 PDPR -OWNERS AGENT LOAD "ROBIN" / CHARTERERS AGENTS
DISCHARGE -ALL D/A COSTS IN LAGOS TO BE FOR RECEIVERS/CHARTERERS ACCOUNT,  AND
SETTELED DIRECTLY WITH THEM. -CLEANING TO CHARTERERS INSPECTORS SATISFACTION. -
ASBATANK C/P -2.5 HOT TOTAL COMMISSION ON FREIGHT / DEADFREIGHT / DEMURRAGE /
DETENTION WHICH WILL BE DEDUCTED BEFORE PAYMENT TO OWNERS. -CHEMLUBE TERMS AS PER
ATTACHED TO APPLY WITH FOLLOWING AMENDMENTS.  CLAUSE  4. OWNERS AGENTS LOAD - ROBIN.
CLAUSE  5. DELETE "OR FROM RECEIVERS/RECEIVERS BANK"  CLAUSE  6. DELETE "KNOWLEDGE OF
AND"  CLAUSE  7. AFTER "WEATHER CONDITIONS" INSERT "AS DEFINED BY PORT
                AUTHORITIES" ADD AT END OF CLAUSE."IF VESSEL LOAD OR
          DISCHARGE AT ANCHORAGE THEN ALL TIME TO COUNT"  CLAUSE  9. ADD AT END:
"PROVIDED ALL PARTIES AGREE TO SIGN" -CLAUSE 14. DELETE FIRST PARA  CLAUSE 17. ADD AT
END: 'UNDISPUTED DEMURRAGE INCURRED IN WAFR TO BE
          PAID EVERY 10 DAYS AGATNST OWNERS TLXD INVOICE.'  CLAUSE 22. DELETE
CLAUSE 30. DELETE  CLAUSE 31. B. ADD AT END NMA LEVY INCLUDING VAT FOR CHTRS ACCOUNT.
END

WE WANT TO THANK ALL PARTIES FOR RESULTING IN THIS FIXTURE AND WISH EVERYBODY A HAPPY
NEW YEAR

BRGDS
IBEX

F 17-0.1        ASBATANKVOY        17–2.1

## FORM No. 17–0.1

## ASBATANKVOY*

### Tanker Voyage Charter Party

### PREAMBLE

| | |
|---|---|
| _____ | Date |
| _____ | Place |

IT IS THIS DAY AGREED between _____ chartered owner/owner (hereinafter called the "Owner") of the _____ SS/MS _____ (hereinafter called the "Vessel") and _____ (hereinafter called the "Charterer") that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A. Description and Position of Vessel: Deadweight: _____ tons (2240 lbs.). Classed: _____. Loaded draft of Vessel on assigned summer freeboard _____ ft. _____ in. in salt water. Capacity for cargo: _____ tons (of 2240 lbs. each) _____% more or less, Vessel's option. Coated: Yes _____. No _____. Coiled: Yes _____. No _____. Last two cargoes: _____. Now: _____. Expected Ready: _____.

B. Laydays: Commencing: _____. Cancelling: _____

C. Loading Port(s): _____. Charterer's Option.

D. Discharging Port(s): _____. Charterer's Option.

E. Cargo: _____. Charterer's Option.

F. Freight Rate: _____. per ton (of 2240 lbs. each).

G. Freight Payable to: _____ at _____.

H. Total Laytime in Running Hours: _____.

I. Demurrage per day: _____.

J. Commission of _____% is payable by Owner to _____ on the actual amount of freight, when and as freight is paid.

K. The place of General Average and arbitration proceedings to be London/New York (strike out one).

L. Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M. Special Provisions: _____.

---

\* Originally this was the EXXONVOY 1969 charter party.

(Rel.52-8/90 Pub.130)

17–2.2                TANKER CHARTER PARTIES                F 17-0.1

In witness whereof, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:

By: _____

Witness the signature of:

By: _____

## PART II

**1. Warranty—Voyage—Cargo.** The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

**2. Freight.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursement or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

**3. Deadfreight.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

(Rel.52–8/90  Pub.130)

F 17-0.1 ASBATANKVOY 17-2.3

**4. Naming Loading And Discharge Ports. (a).** The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | *On a voyage to a port or ports in:* |
|---|---|
| ST. KITTS | Carribean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said.) |

**(b).** If lawful and consistent with Port I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| *Place* | *On a voyage to a port or ports in:* |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

**(c).** Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

**5. Laydays.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date: otherwise this Charter to remain in full force and effect.

**6. Notice Of Readiness.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

**7. Hours For Loading And Discharging.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the

(Rel.52–8/90 Pub.130)

Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

**8. Demurrage.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

**9. Safe Berthing-Shifting.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

**10. Pumping In And Out.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires

on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

**11. Hoses: Mooring At Sea Terminals.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

**12. Dues—Taxes—Wharfage.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

**13. (a). Cargoes Excluded Vapor Pressure.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

**(b). Flash Point.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

**14. (a). Ice.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or, radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio order for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

**(b).** If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if avail-

17–2.6                TANKER CHARTER PARTIES          F 17-0.1

able, with the Charterer, shipper or consignee of the cargo, who shall tele-graph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the neces-sary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

**15. Two Or More Ports Counting As One.** To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the fol-lowing conditions:

(a). Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Char-terer.

(b). All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c). Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d). Time consumed shifting between berths within one of the ports or ter-minals of the particular grouping or combination shall count as used lay-time.

**16. General Cargo.** The Charterer shall not be permitted to ship any pack-aged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as speci-fied in Clause 1.

**17. (a). Quarantine.** Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b). **Fumigation.** If the Vessel, prior to or after entering upon this Char-ter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumi-gation.

**18. Cleaning.** The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) un-seaworthiness existing at the time of loading or at the inception of the voy-age which was discoverable by the exercise of due diligence, or (b) error or

fault of the servants of the Owner in the loading, care or discharge of the cargo.

   **19. General Exceptions Clause.** The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from: — any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner, the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from: — Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

   **20. Issuance And Terms Of Bills Of Lading. (a).** The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

   **(b).** The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

   **(i). Clause Paramount.** This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have

17–2.8          TANKER CHARTER PARTIES          F 17-0.1

effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii). **Jason Clause.** In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii). **General Average.** General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) **Both To Blame.** If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The fore-

going provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) **Limitation Of Liability.** Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) **War Risks. (a).** If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

**(b).** If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge — the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

**(c).** The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other

government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

**(vii). Deviation Clause.** The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

**21. Lien.** The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

**22. Agents.** The Owner shall appoint Vessel's agents at all ports.

**23. Breach.** Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

**24. Arbitration.** Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the

F 17-0.1          ASBATANKVOY                    17-2.11

other party shall not, by notice served upon an officer of the first moving
party within twenty days of the service of such first notice, appoint its arbi-
trator to arbitrate the dispute or differences specified, then the first moving
party shall have the right without further notice to appoint a second arbitra-
tor, who shall be a disinterested person with precisely the same force and ef-
fect as if said second arbitrator has been appointed by the other party. In
the event that the two arbitrators fail to appoint a third arbitrator within
twenty days of the appointment of the second arbitrator, either arbitrator
may apply to a Judge of any court of maritime jurisdiction in the city
above-mentioned for the appointment of a third arbitrator, and the appoint-
ment of such arbitrator by such Judge on such application shall have pre-
cisely the same force and effect as if such arbitrator had been appointed by
the two arbitrators. Until such time as the arbitrators finally close the hear-
ings either party shall have the right by written notice served on the arbitra-
tors and on an officer of the other party to specify further disputes or dif-
ferences under this Charter for hearing and determination. Awards made in
pursuance to this clause may include costs, including a reasonable allowance
for attorney's fees, and judgement may be entered upon any award made
hereunder in any Court having jurisdiction in the premises.

**25. Sublet.** Charterer shall have the right to sublet the Vessel. However,
Charterer shall always remain responsible for the fulfillment of this Charter
in all its terms and conditions.

**26. Oil Pollution Clause.** Owner agrees to participate in Charterer's pro-
gram covering oil pollution avoidance. Such program prohibits discharge
overboard of all oily water, oily ballast or oil in any form of a persistent na-
ture, except under extreme circumstances whereby the safety of the vessel,
cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance con-
trols are required, the Owner will instruct the Master to retain on board the
vessel all oil residues from consolidated tank washings, dirty ballast, etc., in
one compartment, after separation of all possible water has taken place. All
water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation
of oil/water, such demulsifiers shall be obtained by the Owner and paid for
by Charterer.

The oil residues will be pumped ashore at the loading or discharging termi-
nal, either as segregated oil, dirty ballast or co-mingled with cargo as it is
possible for Charterers to arrange. If it is necessary to retain the residue on
board co-mingled with or segregated from the cargo to be loaded, Charterers
shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated
on board, the Master shall arrange that the quantity of tank washings be
measured in conjunction with cargo suppliers and a note of the quantity
measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party
on any consolidated tank washings, dirty ballast, etc., retained on board un-

17–2.12          TANKER CHARTER PARTIES          F 17-0.1

der Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total dead-weight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

# Chemlube Terms
# Dated September 2002

1. <u>N.O.R. and Commencement of Laytime clause</u>
   If the vessel arrives prior to the first day of the agreed laydays, laytime shall not commence before 06:00 hrs local time on the first day of the laydays. Furthermore Charterers always to have the benefit of the six hours notice of readiness at all load or discharging ports even if vessel is already on demurrage. Commencement of loading prior to laydays agreed in this charter party is prohibited, unless sanctioned by Charterers.

   Unless instructed by Charterers to the contrary, vessel shall issue written NOR to agents, shippers, receivers (and copy to Charterers) immediately upon arrival at port regardless of whether same may be appropriate between vis-à-vis Charterers under the terms of this c/p.

2. <u>Freight retention clause in case of R.O.B.</u>
   In event that any cargo remains onboard upon completion of discharge, Charterer shall have the right to claim from freight an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto, provided that the volume of cargo remaining onboard is pump able as determined by an independent surveyor. Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

3. <u>Pumping clause</u>
   The vessel is capable of discharging the captioned cargo at the discharge rate mentioned in this charter party or maintaining a head of 100 PSI at ship's manifold provided shore facilities permit. Should shore installation prevent the vessel from meeting those requirements then master to:

   a) Issue letter of protest to the installation and do his best to obtain acknowledgement of its receipt, and
   b) Insert on statement of facts the number of pumps connected and their capacity as well as the pumping pressure maintained throughout discharge operations, and
   c) Specify shore installation failure on statement of facts, which, if possible, is to be duly countersigned by receivers and failing which Charterers will deduct excessive time spent over and above the warranted limit. Furthermore, should it become necessary to withdraw the vessel from the berth because of vessel's failure to maintain the guaranteed discharge rate, all time and expenses to be for owners account.

4. <u>Agents at load/discharge port</u>
   Owners to appoint and employ agents as selected by Charterers at both load and discharge ports. Owners to place agents in funds prior to arrival of the vessel failing which any damages and/or consequences to be for owner's account. Owners will instruct agents to keep Charterer fully informed about the status of vessel and cargo operations.

5. <u>Discharging without presentation of B/L</u>
   In case original bills of lading are not available at discharge port, owners undertake to release the cargo to receivers against Owners P and I wording letter of indemnity either from Charterers, without bank guarantee, "or from receivers/receiver's bank(s)."

6. <u>Eligibility clause</u>
   Owners warrant that the vessel is in all respects eligible under applicable laws and regulations for trading to the ports and places specified in Part I, and that at all necessary times she will have on board all certificates, records and other documents required for such service.
   Owners shall be responsible for knowledge of and compliance with all restrictions at the loading and discharge ports related to safety and operational matters.

7. <u>Conoco weather clause</u>

Delays in berthing or discharging and any delays after berthing which are due to weather conditions shall count as one half lay-time or, if on demurrage, at one half demurrage rate.

8. De-ballasting clause
De-ballasting never to count as used lay-time, even if vessel already on demurrage. Owners warrant that vessel can discharge the ballast within 6(six) hours or maintain 100 PSI at ships manifold provided shore facilities permit.

9. Demurrage and Claims Time Bar clause
Charterers shall be discharged and released from all liability in respect of claims/invoice Owners may have sent to Charterers under this Charter Party unless Charterers have received an original claim/invoice in writing, with supporting documents within ninety (90) days from completion of discharge of the cargo concerned under this Charter Party.

Any claim/invoice, which owners may have under this Charter Party, shall be deemed to be waived and absolutely barred, if claim/invoice as above specified is not received by Charterers within the agreed time bar.

Demurrage, if any, shall be payable by the Charterers against Owners' invoice supported by Notices and Statements of Facts from loading and discharging port(s) duly signed by Shippers/Receivers respectively.

10. Overage insurance clause
Additional cargo insurance premium resulting from age of vessel to be for Owner's account.

11. Loading and discharging place clause
Charterer shall exercise due diligence to order the vessel only to places which they consider safe for the vessel and where subject to the provisions of Clause 6 hereof she may always lie afloat, but not withstanding anything contained in this or any other Clause of this charter. Charterer shall not be deemed to warrant the safety of any place and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid.

12. Itinerary
Charter party to incorporate a detailed itinerary including following information:
- Vessel position at time of fixture
- Whether ship in ballast or loaded
- Where will the last cargo be discharged and discharge prospects including completion time.
- Cleaning time.
- Upon completion discharge under current employment vessel will proceed without delay and at convenient speed directly in ballast to load port/area specified in this charter party where ETA is..

13. Suitability clause
Vessel's tanks, pumps, lines to be in every way fitted and suitable for the cargo specified in Part I. Owners guarantee vessel is equipped with at least two derricks and/or cranes to serve each side of the vessel, having a certified lifting capacity adequate for the voyage.

14. Substitution clause
There is no liberty to substitute for the performing vessel under this charter party. If one is conferred by express provision of the charter party, the owners' right to substitute is conditioned by the description and the characteristics of the substituting vessel which can not be any less favorable nor occasion any extra costs to the Charterers than the vessel initially named, and in any case is subject to charterers/shippers/receivers approval which shall not be unreasonably withheld.

15. Cleanliness clause

Vessel's tanks, pipes and pumps to be thoroughly cleaned and deodorized for the cargo, to Charterer's and/or shipper's inspector's satisfaction and to surveyor's approval, on arrival at first or sole load port. Should the vessel fail to pass the first tank inspection by Charterer's/shipper's surveyor, the costs for all subsequent inspections to be for owners account.

16. Laytime clause
Time shall not count as laytime, or if on demurrage as demurrage time, when used:

a) For and on an inward passage moving from anchorage, including awaiting tugs, pilot, tide, daylight, locks or any other reason whatsoever over which Charterers have no control, even if lightening has taken place at anchorage, until the vessel is securely moored at the berth or other loading or discharging place specified in part I (C) and (D) hereof.
b) Due to overflow, breakdown, inefficiency, repairs contamination or other cause attributable to the vessel and/or owners including inability to pump out the cargo as provided for in the pumping clause hereof.
c) As a result of strike, go slow, work to rule, lockout, stoppage or restraint of labor involving the master, officers or crew of the vessel or tugs or pilot.
d) In ballasting or de-ballasting, or awaiting the availability of the shore deballasting facilities, unless performed simultaneously with the pumping of the cargo and without delaying same.
e) In cleaning of tanks, pumps and pipelines, bunkering not concurrent with loading or discharging of cargo, discharging residues or for any other purposes of the vessel only.

17. Waiting time clause
Charterers shall have the option to order the vessel to wait at safe location(s) including but not limited to, at or off loading and/or discharging port(s) and/or en route inside or outside territorial waters and/or port limits. However, the specific place closest to the nominated location shall be at the sole discretion of the master in respect of vessel safety. Time used to count as laytime and/or time on demurrage if the vessel is on demurrage.

18. Part cargo segregation clause
In case of part cargo only, owners undertake to keep this cargo completely segregated by double valves from other cargoes on board the vessel.

19. Simultaneous Operation clause
If vessel loads/discharges cargo for other Charterers at same berth(s), all time including waiting time, time used and/or time of demurrage if any, is to be prorated in accordance with the respective cargo quantities of each Charterer. Where waiting time, time used and/or time of demurrage results from the act of any specific Charterer, such time will be attributed to such Charterer.
All laytime used waiting for berth at loading and/or discharging port(s) to be allocated pro rata between all cargoes, bunkers and water being loading and discharged at these berths.

20. Notices clause
Owners/master to give 15/10/7/5/3/2/1 days notice to Charterers and to agents at load and discharge port. Owners to advise keep Broker/Charterers immediately of all changes of more than 12 hours in vessel's ETA or any changes in vessel's itinerary.

21. Heating clause
If the Charter Party, part I, terms provide that the vessel should heat/maintain cargo at a certain temperature, but the cargo is loaded at a lower temperature, then vessel is to issue a Letter of Protest and have this signed by Shipper in load port. Charterer is to be advised as soon as possible after loading as to what was the actual loaded temperature and whether any Letter of Protest has been issued to Shipper. If cargo loaded temperature is less than the nominated temperature, then vessel is to heat up the cargo (by a maximum of ten (10) degrees C) to the nominated temperature. Any such heating/maintaining of cargo temperature is to be for Owner's account.

22. Speed clause
Vessel is to perform the laden voyage at an average speed of.........knots, weather and safe navigation permitting but Charterers have the option to order the vessel to perform the voyage at a speed over or under the above mentioned average speed always weather and safe navigation permitting. Actual incremental costs incurred, if any, to be supported by owner's calculation of time saved/lost, valued at the demurrage rate, together with master/chief engineer's statement as well as last bunkers invoice or bunkers replacement value whichever is lower.

23. General Average/Arbitration clause
General average, arbitration to be in London, English law to apply. York/Antwerp rules 1974 as amended 1994 to apply to this charter party.

24. Classification Society clause
Owners warrant that the vessel is classified with a member of the IACS (International Association of Classification Societies).

25. Insurance clause
Vessel's P and I club is a member of the international group of P and I clubs. Owners warrant that the vessel is fully covered by this P and I club for the duration of the charter party. Furthermore owners warrant that they have and will maintain throughout the period of this charter:

a) The standard oil pollution insurance cover (currently USD 1 billion) available from there P and I club.

At any time on or subsequent to the fixture date of this charter, the owners, upon Charterers request, shall furnish to Charterers or their representative proof satisfactory to Charterers of such insurance.

26. ITOPF clause
The revised P and I club ITOPF clause is incorporated into this charter party.

Owners warrant that throughout the duration of this charter, the vessel will be:

a) Owned or demise chartered by a member of the 'international tanker owners pollution federation limited and that the membership will be maintained throughout the duration of the voyage,
b) Entered in the protection and indemnity 'P and I' club Messrs.                    and that this P and I club cover will be maintained throughout the duration of the voyage.

27. Shifting clause
Charterers to have the option to shift the vessel to additional berth(s) at Charterers expenses, time used not to count as laytime.

28. International Safety Management (ISM) clause
Owner's warrants that a 'Safety Management System (SMS)' in accordance with the 'ISM Code' will be in operation throughout the duration of this charter. It is a condition of this Charter party that on and after 1st July 1998 the Owner(s) or "the Company" (as defined by the ISM Code) shall have a valid 'Document Of Compliance (DOC)' and the vessel shall have a valid 'Safety Management Certificate (SMC)'. Upon request the Owner(s) shall provide a true copy of the relevant DOC and SMC to the Charterer. Without limitation to Charterer's remedies under this clause, Owner shall indemnify the Charterer for any losses, damages or expenses directly/indirectly attributed to vessel's non-compliance with the ISM code and/or to Owner's failure to respond (or delay in responding) to Charterer's request for the foregoing certificates and any delays, to the extent arising from such non-compliance or failure/delay in responding, shall not count as laytime or if vessel is on demurrage, as time on demurrage.

29. Charter party clause

The agreed terms and conditions of this charter shall be by the evidenced and recorded by the production of a full fixture recap sent by Ibex Maritime Ltd to both Charterers and Owners for signature. No other written and signed charter party will be produced unless specifically requested by Charterers or Owners.

30. Brazil clause
   a) Rio de Janeiro (Exxon terminal)
      Any waiting time for berthing and/or unberthing due to no night time navigation not to count as laytime and/or demurrage.
      Vessel to be Exxon approved during her stay in loadingport.
      Vessel to have minimum 65 meters flat side upon arrival at berth. The exact flat side of the vessel upon arrival to be stipulated in the fixture recap.

   b) Madre de Deus
      Upon request of the Charterers, Owners to fill in questionnaire from Shippers.

31. Nigeria clause
   a) All disbursements costs in Nigeria for Charterers/Receivers account and to be settled directly via Charterers agents.

   b) NMA Clause: Charterers warrant that the cargo shipped under this charter party covered by duly approved NMA documentation, Charterers herewith indemnify Owners for any and all penalties, if any, and to pay for detention, if any, at the demurrage rate stipulated in this charter party as a result of failure to comply with the required NMA documentation.

   c) Upon request of Charterers, vessel to lighter into barges if requested and if further requested by charterers, vessel to receive the quantities back into the vessels cargo tanks from the barges from subsequent discharge ashore. Charterers will take full responsibility for the quantity and quality of the product discharged into barge(s) and back again. Owners and Vessel to be held harmless for this operation at all time, delay and equipment used for this operation to be for Charterers account, risk, time and expense.

32. Detention clause
   In the event of any circumstances, which might result in a claim for "detention", Charterer shall in no case be liable for an amount in excess of that which would be calculated at the c/p demurrage rate.

33. Letter of Protest clause
   Master to issue Letter of Protest to Shippers, if difference in quantity/quality according to voyage instruction/delays caused by slow loading or discharging or if cargo is loaded at less temperature than stipulated as above and to heat up cargo as per Charterers instructions before arrival in dischargeport, but heating up costs for Charterers account.

34. Bill of Lading alterations clause
   Charterers have the option to make alterations in Bill of Ladings after loading if necessary, and alterations will always be for Owners reconfirmation and approval. In case of change of b/ladings, Charterers bank will send a confirmation directly to Owners when they are in possession of the old set of b/ladings and it will be forwarded to a place nominated by Owners stamped "Null and Void" as soon the have received the corrected new set of b/ladings which have been approved by Owners and issued by Ibex Maritime Ltd.

35. Invoice clause
   On behalf of Owners Ibex Maritime Ltd shall issue invoices on their letterhead for freight / dead freight / demurrage with Owners banking details for direct   from Charterers to Owners bank account less commission.

36. Sample clause
   Upon loading/discharging, master/officer to take sealed manifold and foot sample together with local independent surveyor and try to obtain the independent surveyors to sign the sealed samples. These sealed samples to be kept onboard the vessel for at least 12 months and to be send to independent surveyor nominated by Charterers upon their request, for testing in case of claim from receivers for contamination of cargo.

08/09/2005 10:24 FAX 212 869 0699   HILL RIVKINS   TRIMAR DEFENSE 2   ☒002/002

Case 2:05-cv-02590-SAS-GWG   Document 10-10   Filed 09/09/2005   Page 1 of 2.



# HILL RIVKINS & HAYDEN LLP

45 Broadway, Suite 1500, New York, NY 10006-3739   Tel: (212) 669-0600
Fax: (212) 669-0698/0699                           e-mail: thefirm@hillrivkins.com
Website: www.hillrivkinslaw.com

August 9, 2005

*Via Telecopier: 212-425-8147*
Trimar Defense Services Inc.
30 Broad Street – 43rd Floor
New York, New York 10004-9998

Attention:   Mr. Ian Duthie

Re:   **M/T BEFFEN**
      **Paulsboro/Lagos**
      **Bls/L #1, 2 & 3**
      **Dated: 6 February 2004**
      **Our File No: 28660-KBD**

Dear Sirs:

We acknowledge receipt of your letter of 5 August 2005.

Addressing the point made in your letter, our withdrawal of the arbitration in London has nothing to do with granting you an extension to respond to the demand nor to withdrawing the extension.

I remind you that in our meeting of July 11, 2005, we informed you that we intend to pursue this matter in Nigeria. At that time you were on notice that we did not intend to litigate this matter in London. Our position was further reiterated in our letter of 2 August 2005 where we informed you of advices given to us by counsel in Nigeria.

In view of the foregoing, we must reject your position. The arbitration in London has been closed and we intend to pursue recovery in Nigeria.

Very truly yours,

HILL RIVKINS & HAYDEN LLP

Keith B. Dalen

/cb
055-trimar

NEW JERSEY
924 US Highway 9 South (Route 9 South)
South Amboy, NJ 08879-3313
Tel: (732) 838-0300  Fax: (732) 316-2365
e-mail: thefirm@hillrivkins.com

TEXAS
712 Main Street, Suite 1515
Houston, TX 77002-3209
Tel: (713) 222-1515  Fax: (713) 222-1359
e-mail: hillrivkinstexas@hillrivkins.com

CONNECTICUT
1115 Broad Street
Bridgeport, CT 06604
Tel: (203) 367-5535  Fax: (203) 367-5536
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Of Counsel
Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: (916) 859-4910  Fax: (916) 859-4911

STATE OF NEW YORK  :
                   :  SS.:
COUNTY OF NEW YORK :

MARIE T. CUSH being sworn says:  I am not a party to the action, am over 18 years of age and reside at 311 Travers Place, Lyndhurst, N.J.

On August 10, 2005, I served a true copy of the annexed AMENDED ANSWER WITH AFFIRMATIVE DEFENSES AND COUNTER CLAIM

TO:  HILL RIVKINS & HAYDEN LLP
     Attorneys for Plaintiff
     45 Broadway  Suite 1500
     New York, NY 10006
     (212) 669-0600

on this date by mailing the same in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service.

_____
MARIE T. CUSH

Sworn to before me this
10th day of August, 2005

_____
     Notary Public

GARTH S. WOLFSON
NOTARY PUBLIC
State of New York No. 02WO5076941
Qualified in New York County
Term Expires 1/18/07

FAX TRANSMISSION 

Beaufort House
Chertsey Street
Guildford GU1 4HA
United Kingdom
Telephone: +44 (0) 1483 55 55 55
Facsimile: +44 (0) 1483 58 73 30
DX: 2406 Guildford
www.clydeco.com

LONDON  GUILDFORD  CARDIFF  PARIS  NANTES  BELGRADE  PIRAEUS  ST PETERSBURG  DUBAI  ABU DHABI  SINGAPORE  HONG KONG  CARACAS

| | |
|---|---|
| To | Bryggen Shipping & Trading A/S |
| Fax no | 00 47 55 326810 |
| Attn | Managing Director/Claims Manager |
| | |
| To | TESMA (India) Pvt Ltd |
| Fax no | 00 91 22 5504 1011 |
| Attn | Managing Director/Claims Manager |
| | |
| To | Gard AS, Arendal |
| Fax no | 00 47 37 02 48 10 |
| Attn | Claims Department |
| | |
| To | Gard (UK) Ltd |
| Fax no | 020 7623 8657 |
| Attn | Claims Department |
| | |
| Cc | Mr Mark Hamsher |
| Fax no | 020 7702 2520 |
| Date | 4 March 2005 |

Our ref    MJK/PDR/New

Total pages (including cover)   2

"BEFFEN"
Tanker Bills of Lading Nos. 1,2 & 3 issued Paulsboro, New Jersey, 6th February 2004
Voyage: Paulsboro, New Jersey - Lagos, Nigeria
Cargo:  10,647,261 metric tonnes raw material for lube oil
Claims: Cargo loss/damage
Charterparty/Fixture Note dated 31st December 2003

Kindly take notice that we represent the owners of (and those entitled to sue in relation to) the above cargo (including but not limited to Chemlube International Inc., BNP Paribas (Suisse) SA,

GFDLIT 559006.1

IF YOU HAVE NOT RECEIVED THE TOTAL NUMBER OF PAGES OR NEED ASSISTANCE, PLEASE CALL +44 (0) 1483 55 55 55
CONFIDENTIALITY NOTICE

This facsimile and/or the documents accompanying it may be privileged and confidential and exempt from disclosure under applicable law. If the reader is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, any unauthorised use, disclosure, copying, distribution or dissemination is strictly prohibited. If you have received our facsimile (or any copy) in error, please immediately notify us by telephone on +44 (0) 1483 55 55 55 and return this facsimile and any copies to us as soon as possible. Thank you.
A multinational partnership of solicitors and registered foreign lawyers. A list of partners' names is available on request.
Regulated by the Law Society

Ibeto Petrochemical Industries Ltd, the insurers of the cargo and the lawful holders of the Bills of Lading) in relation to all and any claims which have arisen under the above-captioned Bills of Lading.

The cargo was carried on board the "BEFFEN" from Paulsboro, New Jersey to Lagos, Nigeria in February/March 2004 and was found to be lost/damaged on discharge.

We now call upon you to join in the appointment of a sole arbitrator in respect of all and any claims arising under the above Bills of Lading in accordance with the reference to "arbitration to be in London" at clause 23 of the Chemlube Terms dated September 2002 which form part of the Charterparty/Fixture Note dated 31st December 2003 which, in turn, is incorporated into the Bills of Lading contracts.

The Claimants' nominee is Mr Mark Hamsher who reads this fax in copy. We call upon you to agree his appointment within 28 days (section 16 (3) Arbitration Act). Mr Hamsher's contact details are 18C Ensign Street, London E1 8JD; (Tel) +44 20 7265; (Fax) +44 20 7702 2520.

Without prejudice to any correspondence passing between the Claimants and yourselves to date, please treat this fax as notice of the Claimants' claims in writing.

Regards,

CLYDE & CO.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------X     **05 CIV 2590**
**(SAS)**
**IBETO PETROCHEMCIAL INDUSTRIES LTD.**

                    Plaintiff,

    **DECLARATION**

      -against-

**M/T "BEFFEN" , her engines, tackle,**
**boiler, etc** *in rem;* **and BRYGGEN**
**SHIPPING AND TRADING A/S,** *in*
***Personam,***

                  Defendants
--------------------------------------------------X

    **I, BABAJIDE KOKU,** hereby declare as follows:

1.    I am a barrister and solicitor of the Supreme Court of Nigeria and practice as such in the law firm of Babajide Koku & Co of Suite 11, 53 Lawson Street, Moloney, Lagos, Nigeria. I obtained my LLB at the University of Ife in 1980 and attended the Nigerian Law School, obtaining my Barrister of Law Certificate in 1981, and was called to Bar in the same year. I have practiced as a Barrister and Solicitor in marine and commercial law since 1985 and am currently the senior partner in the law firm Babajide Koku & Co. I am a member of the Nigerian Bar Association and Nigerian Maritime Law Association.

2.    **IBETO PETROCHEMCIAL INDUSTRIES, LTD.** commenced an admiralty action <u>in rem</u> in the Federal High Court in Lagos, Nigeria, and so as to avoid arrest of the vessel, a bond was

posted to secure plaintiff's claim.  On behalf of the Owners of
the **M/T BEFFEN, BRYGGEN SHIPPING AND TRADING
A.S. (BRYGGEN)**        , I have been actively monitoring the
Nigerian proceedings, and based on my own personal
knowledge and my review of the file maintained by my office,
I am familiar with the facts and circumstances underlying the
matter.

3. I understand that Clause 20 of the ASBATANKVOY Terms
   applicable to this shipment contractually incorporates the
   United States Carriage of Good by Sea Act **(COGSA)**, and the
   fixture's notation of **"FREIGHT LUMSUM"** confirms that the
   cargo would be considered as one "customary freight unit" for
   the purposes of the limitation of liability under United States
   law.

4. However, it is my firm opinion that a Nigerian court would
   nonetheless follow the domestic law of Nigeria, and that the
   United States **COGSA** would not be applied to the Nigerian
   lawsuit especially as the bill of lading does not contain a
   Clause Paramount.  See the Nigerian Supreme Court decision
   in **Leventis Technical Limited v. Petrojessica Enterprises
   Limited (1999) 6 NWLR (Pt. 605) 45.**

5. While Nigeria's domestic law provides for a liability limitation
   based on a "package" or "unit," it does not contain a limitation
   based on the "customary freight unit" provided by the United
   States **COGSA**.  **Article IV Rule 5 of the Nigerian
   Carriage of Goods by Sea Act** (Cap. C2, LFN 2004) provides
   as follows:

   *"Neither the carrier nor the ship shall in any*

*event be or become liable for any loss or damage
to or in connection with goods in an amount
exceeding N200 **per package or unit**, or the
equivalent of that sum in other currency, unless
the nature and value of such goods have been
declared by the shipper before shipment and
inserted in the bill of lading."*

6. In addition, as the Statement of Claim in the Nigerian action
   repeatedly makes clear, plaintiff is suing for cargo damage
   pursuant to "tanker Bills of Lading No. 1, No. 2 and No. 3"
   with damages claimed in the amount of $3,260,443.73 (Three
   Million, Two Hundred and Sixty Thousand, Four Hundred and
   Forty-three United States Dollars and Seventy-three cents).

7. Moreover, aside from issuing the order of arrest, the case has
   not yet been meaningfully prosecuted in Nigeria. The
   Nigerian court has not reached the merits of the case. The
   Suit was mentioned in Court on the following dates
   11/9/2004, 12/7/2004, 2/2/2005, 3/3/2005, 4/14/2005,
   5/24/2005 and 7/18/2005. Now that plaintiff's intention to
   pursue the matter in Nigeria has become clear, a hearing has
   been scheduled, but still only as to preliminary matters, and it
   will not even go forward until October 6, 2005.

   Pursuant to 28 U.S.C § 1746, I declare under penalty of
   perjury that the foregoing is true and correct.

   Executed on 8th September, 2005

## IN THE FEDERAL HIGH COURT
### HOLDEN AT LAGOS

BETWEEN:

SUIT NO: FHC/L/CS/249/2004

IBETO PETROCHEMICAL INDUSTRIES LTD....PLAINTIFF/APPLICANT

AND

1. M/T BEFFEN
2. OWNERS OF THE VESSEL M/T BEFFEN
3. CHARTERERS OF THE VESSEL M/T BEFFEN          } DEFENDANTS
4. MASTER OF THE VESSEL M/T BEFFEN

ORDER

UPON THIS MOTION EX-PARTE dated and filed on the 19th day of March, 2004, coming before this court, praying for the following orders: -

(1) An order to arrest and detain the Motor Tanker M/T BEFFEN presently lying at the Anchorage, Apapa Port, Lagos or anywhere within the jurisdiction of this Honourable Court pending the provision of a Bank Guarantee from First Bank of Nigeria Plc. Or Union Bank of Nigeria Plc. as security for the Plaintiff's claim pending the hearing and determination of the suit herein.

(2) AND any other order or orders which this Honourable Court may deem fit to make in the circumstances.

UPON READING the affidavit in support and affidavit of Urgency both sworn to by Taiwo

M. T. AWOKULEHIN
(JUDGE)

CERTIFIED TRUE COPY
CHIEF REGISTRAR
FEDERAL HIGH COURT
LAGOS.

Oyeniyi, Male, Nigerian, Shipping Manager of 4A, Adeola Hopewell Street, Victoria Island, Lagos.

AND UPON HEARING Olumide Sofowora with him Lawrence Ezeana of Counsel for the Plaintiff/Applicant move in terms of the Motion Paper.

IT IS HEREBY ORDERED AS FOLLOWS: -

(1)  That the motor tanker M/T BEFFEN presently lying at the anchorage Apapa Wharf or any where within the jurisdiction of this Court be arrested and detained pending the provision of a bank guarantee from First Bank of Nig. Plc. or Union Bank of Nig. Plc. as security for the Plaintiff's claim pending the hearing and determination of the suit.

(2)  That motor tanker M/T BEFFEN presently the subject matter of this application is not positioned at a place that blocks either.

(a) The New Oil Jetty (NOJ)
(b) The Petroleum Wharf, Apapa (PWA)
(c) The Bulk Oil Plant (BOP

(3)  The Plaintiff/Applicant shall give a written undertaking to Indemnify the Defendants/Respondents for any loss or damage the Defendants/Respondents may sustain should it later turn out that this Court ought not to have made this order of arrest and detention.

CERTIFIED TRUE COPY
CHIEF REGISTRAR
FEDERAL HIGH COURT
LAGOS.

2

(4) That the case is made returnable on the 30th day of March, 2004.

ISSUED AT LAGOS, Under the Seal of the Court and the Hand of the Presiding Judge this 19th day of March, 2004.

SIMEON OMOTEHINSE
SNR. REGISTRAR

CERTIFIED TRUE COPY
CHIEF  REGISTRAR
FEDERAL HIGH COURT
LAGOS.

THE DEPUTY SHERIFF
FEDERAL HIGH COURT
LAGOS

3

6/10

IN THE FEDERAL HIGH COURT
HOLDEN AT LAGOS
SUIT NO. FHC/L/CS/ 249 /2004

## ADMIRALTY ACTION IN REM

BETWEEN:-

IBETO PETROCHEMICAL INDUSTRIES LTD.          PLAINTIFF/APPLICANT

            AND

1. M/T BEFFEN
2. OWNERS OF THE VESSEL M/T BEFFEN
3. CHARTERERS OF THE VESSEL M/T BEFFEN          .DEFENDANTS
4. MASTER OF THE VESSEL M/T BEFFEN

## STATEMENT OF CLAIM

1.  The Plaintiff sues by way of an Admiralty Action in Rem against the Motor Tanker M/T BEFFEN and claims against the Defendants jointly and severally the sum of US$500,000.00 as Special and General Damages for negligence and breach of contract arising from the carriage by Defendants of 8,048.175 Metric Tonnes of raw material Base Oil more particular set out in Final Invoice Number #CI.0042 dated 6th February, 2004 issued in favour of the Plaintiff by Chemlube International Inc., Plaintiff's supplier and carried on Plaintiff's behalf by the Defendant under and by virtue of Tanker Bill of Lading Numbers 1 dated at Paulsboro, USA on 6th February, 2004 and signed by Defendants' agent. The goods were carried on board the vessel M/T BEFFEN from the Port of Paulsboro, New Jersey, USA to Apapa Port, Lagos, Nigeria. Upon pumping of the goods into the Plaintiff's tanks, it was discovered that 949.157 Metric Tonnes or 1,073,227 Litres of raw material Base Oil was contaminated and/or mixed up with water. The contamination took place on board the vessel.

2.  The Plaintiff is a Limited Liability Company, carrying on inter-alia the business of importation of Base Oil and other Lubricants for the purposes of sale and has its registered office at No.4A, Adeola Hopewell Street, Victoria Island, Lagos, Nigeria.

3.  The 1st Defendant carried the Plaintiff aforesaid goods from the Port of Paulsboro, New Jersey, USA to Apapa Port, Lagos and berthed at Ibru Jetty, Ibafon, Apapa Port, Lagos.

4.  The 2nd and 3rd Defendants are at all times material to this suit, ship owners and/or ship operators and/or Liner Manager and/or agents and/or Demise Charterers of the vessel M/T BEFFEN and have their registered offices outside the jurisdiction of this Honourable Court. The 4th Defendant is the Master of M/T BEFFEN.

5.  By a Tanker Bill of Lading Number #1 dated at Paulsboro, New Jersey, USA on 6th February, 2004, the Defendant herein carried for and on behalf of the Plaintiff, 8,048.175 Metric Tonnes of raw material Base Oil.

6.  At all material times, the Plaintiff was the owner and/or cargo receiver and/or holder and/or endorsee and/or consignee of the said Tanker Bill of Lading relating to the said goods shipped on board the vessel M/T BEFFEN and in whom the title to the said goods vested by virtue of being such holder and/or consignee and/or endorsee. Freight for the aforesaid shipment on board M/T BEFFEN had been paid in accordance with the aforesaid Bill of Lading.

7.  The said goods were shipped on board the M/T BEFFEN on 6th February, 2004.

8.    On or about 5th March, 2004, the M/T BEFFEN arrived Ibru Jetty, Ibafon, Apapa, Lagos, but on arrival, failed to deliver the goods in accordance with the terms contained in the Tanker Bill of Lading aforesaid but upon pumping of the cargo into the Plaintiff's Tanks, it was discovered that 949.157 Metric Tones or 1,073,227 Litres of raw material Base Oil pumped into the Plaintiff's Tank Nos. 32, 3P and 6P was contaminated or mixed up with water. The contamination took place whilst the cargo was on board the 1st Defendant vessel.

9.    The Plaintiff's Superintendent, Calibrate Inspection Services, who was on board the vessel at all material times protested to the Master of the vessel in writing and in spite of subsequent verbal demand made by the Plaintiff, the Defendant has refused and/or neglected to pay for the loss thus occasioned. The Plaintiff also carried out a Laboratory analysis of the Oil which revealed that the Oil was contaminated with sea water.

10.    The 4th Defendant admitted orally and in writing to Plaintiff's Superintendent that sea water entered the vessel's Tank during the voyage.

11.    The goods aforesaid were in the custody and under the control of the Defendants up to the time of landing at Apapa Port, Lagos.

12.    Further and alternatively, the Plaintiff claims against the Defendants for negligence and/or breach of duty of care as Bailees of the Plaintiff's goods aforesaid for reward.

## PARTICULARS OF NEGLIGENCE

(a) By issuing the Tanker Bill of Lading aforesaid, the Defendants acknowledge the receipt of the said goods in good order and condition and in accordance with the said Bill of Lading aforesaid on board the M/T BEFFEN.

(b) The goods were in the custody and under the care of the Defendants as Bailees for reward during the voyage from Paulsboro, New Jersey, USA, to Apapa Port and up to the landing of the said goods at Apapa Port.

(c) The Defendants thereby owe the Plaintiff a duty of care to see to it, that the goods are delivered to the Plaintiff in the same good order and condition as they were received on board M/T BEFFEN.

(d) Upon pumping of the cargo into the Plaintiff's Tank, it was discovered that 949.157 Metric Tonnes or 1,073,227 Litres of the raw material Base Oil pumped into Plaintiff's Tank Nos. 38, 3P and 6P was contaminated and/or mixed up with water. The contamination took place while the cargo was on board the vessel.

(e) The Defendants thereby breached the duty of care, owed the Plaintiff arising out of the bailment of the goods as aforesaid.

(f) At the trial of this action, the Plaintiff shall rely on the aforesaid facts to establish the plea of *res ipsa loquitor.*

13. At the trial of this action, the Plaintiff shall rely on the following documents to establish its claim.

     (i)    Final Invoice Number #CL0042 dated 6th February, 2004 issuby the Plaintiff's suppliers Chemlube International Inc.

     (ii)    Combined Certificate of Value and of Origin and Invoice of Goods for Exportation to Federation of Nigeria and Packing List.



8/10

FORM 1
(Order 6 Rules 1 and 8)
(Order 12 Rule 18)
WRIT OF SUMMONS

IN THE FEDERAL HIGH COURT
IN THE LAGOS JUDICIAL DIVISION
SUIT NO. FHC/L/CS/ 249 /2004

ADMIRALTY ACTION IN REM

BETWEEN:-

IBETO PETROCHEMICAL INDUSTRIES LTD.          PLAINTIFF/APPLICANT

                    AND

1. M/T BEFFEN
2. OWNERS OF THE VESSEL M/T BEFFEN
3. CHARTERERS OF THE VESSEL M/T BEFFEN          .DEFENDANTS
4. MASTER OF THE VESSEL M/T BEFFEN

TO:    M/T BEFFEN
       c/o The Master of the M/T Beffen,
       The Anchorage, Apapa Port,
       Lagos.

OWNERS OF THE VESSEL M/T BEFFEN,
c/o The Master of the M/T Beffen,
The Anchorage, Apapa Port,
Lagos.

CHARTERERS OF THE VESSEL M/T BEFFEN,
c/o The Master of the M/T Beffen,
The Anchorage, Apapa Port,
Lagos.

THE MASTER OF THE VESSEL M/T BEFFEN,
The Anchorage, Apapa Port,
Lagos.

IN THE: LAGOS JUDICIAL DIVISION OF THE FEDERAL HIGH COURT, LAGOS.

You are hereby commanded that within Eight days after the service of this Writ on you, inclusive of the day of such service, you do cause an appearance to be entered for you in an action at the Suit of: IBETO PETROCHEMICAL INDUSTRIES LTD; and take notice that in default of your so doing the Plaintiff may proceed therein, and judgment may be given in your absence.

Dated this....19th.......day of......March.......2004

...................
REGISTRAR

By Order of the Court

8.   On or about 5th March, 2004, the M/T BEFFEN arrived Ibru Jetty, Ibafon, Apapa, Lagos, but on arrival, failed to deliver the goods in accordance with the terms contained in the Tanker Bill of Lading aforesaid but upon pumping of the cargo into the Plaintiff's Tanks, it was discovered that 949.157 Metric Tones or 1,073,227 Litres of raw material Base Oil pumped into the Plaintiff's Tank Nos. 32, 3P and 6P was contaminated or mixed up with water. The contamination took place whilst the cargo was on board the 1st Defendant vessel.

9.   The Plaintiff's Superintendent, Calibrate Inspection Services, who was on board the vessel at all material times protested to the Master of the vessel in writing and in spite of subsequent verbal demand made by the Plaintiff, the Defendant has refused and/or neglected to pay for the loss thus occasioned. The Plaintiff also carried out a Laboratory analysis of the Oil which revealed that the Oil was contaminated with sea water.

10.    The 4th Defendant admitted orally and in writing to Plaintiff's Superintendent that sea water entered the vessel's Tank during the voyage.

11.    The goods aforesaid were in the custody and under the control of the Defendants up to the time of landing at Apapa Port, Lagos.

12.    Further and alternatively, the Plaintiff claims against the Defendants for negligence and/or breach of duty of care as Bailees of the Plaintiff's goods aforesaid for reward.

## PARTICULARS OF NEGLIGENCE

(a) By issuing the Tanker Bill of Lading aforesaid, the Defendants acknowledge the receipt of the said goods in good order and condition and in accordance with the said Bill of Lading aforesaid on board the M/T BEFFEN.

(b) The goods were in the custody and under the care of the Defendants as Bailees for



# HILL RIVKINS & HAYDEN LLP

45 Broadway, Suite 1500, New York, NY 10006-3739    Tel: (212) 669-0600
Fax: (212) 669-0698/0699          e-mail: thefirm@hillrivkins.com
Website: www.hillrivkinslaw.com

August 2, 2005

**Via Telecopier & Mail: 212-425-8147**

Trimar Defense Services Inc.
30 Broad Street – 43rd Floor
New York, New York 10004-9998

Attention:     Mr. Ian Duthie

           Re:    **M/T BEFFEN**
                  **Your File No: 390JM2851-31P012**
                  **Our File No: 28660-KBD**

           **"WITHOUT PREJUDICE"**

Dear Sirs:

      In our last meeting you mentioned that your Nigerian counsel had advised you that he expected to be successful in staying the lawsuit in Nigeria pending arbitration in London.

      We contacted counsel in Nigeria regarding the foregoing and he advised us that the Admiralty Jurisdiction Act of 1991 would preclude such an action. We enclose a copy of the statute for your ready reference. It would appear that subsections a, b, d and f would apply to the subject case.

      In addition to the foregoing statute, counsel believes that under Nigerian law the incorporation of a document (i.e. the charter party) to which the consignee is not a party would not be effective. In addition, it is doubtful that the arbitration clause would be enforceable under English law given the failure to mention the arbitration clause in the incorporating language in the bill of lading.

NEW JERSEY
924 US Highway 9 South (Route 9 South)
South Amboy, NJ 08879-3313
Tel: (732) 838-0300 Fax: (732) 316-2365
e-mail: thefirm@hillrivkins.com

TEXAS
712 Main Street, Suite 1515
Houston, TX 77002-3209
Tel: (713) 222-1515 Fax: (713) 222-1359
e-mail: hillrivkinstexas@hillrivkins.com

CONNECTICUT
1115 Broad Street
Bridgeport, CT 06604
Tel: (203) 367-5535 Fax: (203) 367-5536
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Of Counsel:
Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: (916) 859-4910 Fax: (916) 859-4911

Case 2:05-cv-02590-SAS-GWG      Document 10-14      Filed 09/09/2005      Page 2 of 4

August 2, 2005
Page Two


     Finally, we note that Nigerian law applies for an interest rate of 35% per annum on judgments. Utilizing such a rate of interest, our claim is now worth $2.2 million and may well consume the full amount of the bank guarantee once the case is finally resolved.

     In view of the foregoing, we renew our offer to recommend settlement of this matter for $██████████ Should you fail to offer this amount and should the matter be litigated in Nigeria, we shall hold the vessel owner liable for the full amount of the loss plus interest.

               Very truly yours,

          HILL RIVKINS & HAYDEN LLP

               Keith B. Dalen

/co
Enclosure

HILL
RIVKINS

## CHAPTER 23

### OUSTER OF JURISDICTION

**SECTION 20.**

Any agreement by any person or party to any cause, matter or action which seeks to oust the jurisdiction of the Court shall be null and void, if:-

(a) the place of performance, execution, delivery, act or default is or takes place in Nigeria; or

(b) any of the parties resides or has resided in Nigeria; or

(c) the payment under the agreement (implied or express) is made or is to be made in Nigeria or

(d) in any admiralty action or in the case of a maritime lien, the plaintiff submits to the jurisdiction of the Court and makes a declaration to that effect or the *res* is within Nigerian jurisdiction; or

(e) it is a case in which the Federal Military Government or a State of the Federation is involved and the Government or State submits to the jurisdiction of the Court; or

(f) there is a financial consideration accruing in, derived from, brought into or received in Nigeria in respect of any matters under the admiralty jurisdiction of the Court; or

(g) under any convention for the time being in force to which Nigeria is a party the national court of a contracting State is either mandated or has a discretion to assume jurisdiction; or

(h) in the opinion of the Court, the cause, matter or action should be adjudicated upon in Nigeria.

## Section 22

### OUSTER OF JURISDICTION

**22.01 Comments.**

As has already been observed under section 10 ( page 17 supra), the Court retains its discretion whether or not to stay proceedings where a contractual jurisdiction clause giving jurisdiction to a foreign forum exists. In the absence of Section 20, the Court would have been obliged to dismiss such suits on the grounds that it had no jurisdiction. Under section 20, provided the case is an admiralty matter and provided one of the criteria listed in subsection (a) to (h) of the section is applicable, then the court would have jurisdiction to try the case. Subsection (h) would seem to give the Court an "inherent" jurisdiction to try a cause where no other excuse for doing so exists. See generally my comments in Chapter 1 at page 18 supra.

## SECTION 21

## CHAPTER 24

### PRACTICE AND PROCEDURE

**23.00** The Chief Judge of the Court may make rules of practice and procedure for carrying into effect the objects of this Decree.

**23.01 Comments.**

Pursuant to the powers granted by this section, the Chief Judge has enacted the Admiralty Jurisdiction Procedure Rules 1992. See Part 3 infra.

STATE OF NEW YORK   :
                    :  SS.:
COUNTY OF NEW YORK  :

MARIE T. CUSH being sworn says:  I am not a party to the action, am over 18 years of age and reside at 311 Travers Place, Lyndhurst, N.J.

On September 9, 2005, I served a true copy of the annexed NOTICE OF MOTION, RULE 56.1 STATEMENT and DECLARATION OF BJOERN PAUL LANDOEY

TO:  HILL RIVKINS & HAYDEN LLP
     Attorneys for Plaintiff
     45 Broadway  Suite 1500
     New York, NY 10006
     (212) 669-0600

on this date by mailing the same in a sealed envelope, with postage prepaid thereon via FEDERAL EXPRESS

_____
                MARIE T. CUSH

Sworn to before me this
9th day of September, 2005

_____
     Notary Public

GARTH S. WOLFSON
NOTARY PUBLIC
State of New York No. 02WO5076941
Qualified in New York County
Term Expires